

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **LOLITA SUTTON, SEQUOYAH WILDER, CAROLYN HAMMELL, and ROSA RICHARDSON,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No.: 2:12-CV-3864-VEH** |
| **ADVANCED CORRECTIONAL HEALTHCARE, INC.,** | ) ) ) | |
| **Defendant.** | ) ) | |

---

## MEMORANDUM OPINION

This is a civil action originally filed by the plaintiffs, Lolita Sutton, Sequoyah Wilder, Carolyn Hammell, and Rosa Richardson, against the defendant, Advanced Correctional Healthcare ("ACH"). (Doc. 1). The complaint alleges that the defendant discriminated against Sutton, Hammell, and Richardson[1] because of their race, African American, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") (Count One). The complaint also alleges that the defendant discriminated against Hammell and Richardson, because of their age, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et*

---

[1] Plaintiff Wilder's claims were dismissed from this suit on November 1, 2013. (Doc. 21).

*seq.* ("ADEA") (Count Three).[2]  All claims arise out of the plaintiffs' solicitation of employment from the defendant.

The case comes before the court on the defendant's Motion for Summary Judgment (doc. 23), filed on November 27, 2013.  For the reasons stated herein, the motion will be **GRANTED** and this case will be **DISMISSED with prejudice**.

## I.    STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted).  The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go

---

[2]  There is no "Count Two."

beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict

3

if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

4

II.   **FACTS**

A.   <u>**Facts Proffered By the Defendant and Admitted By the Plaintiffs**</u>

This court's summary judgment scheduling order provides:

The first section [of the non-moving party's brief in response to the motion for summary judgment] must consist of only the non-moving party's disputes, if any, with the moving party's claimed undisputed facts. The non-moving party's response to the moving party's claimed undisputed facts shall be in *separately numbered paragraphs* that coincide with those of the moving party's claimed undisputed facts. Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based. *All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*

(Doc. 3 at 17) (emphasis in original).  The plaintiffs' response to the motion failed

to comply with this requirement.  Accordingly, the following facts, set out exactly as

they were offered by the defendant, are deemed to be admitted:

1.   ACH is a privately-held, physician-owned Illinois corporation founded in 2002 for the purpose of providing managed inmate healthcare services. ACH provides services to over 20,000 detainees in 17 states, and it specializes in delivering inmate healthcare services in the county jail setting.

2.   ACH develops a program customized to each individual facility it serves, based on the facility's healthcare system, inmate population, healthcare concerns and issues, and facility goals.  ACH contracted with the Jefferson County Sheriff and Jefferson County to provide services at the Jefferson County, Alabama Jail beginning December 1, 2011.

3.      At the time that ACH entered into the Agreement with Jefferson County, healthcare services at the Jefferson County Jail were being provided by a different company, Health Assurance, LLC. Lolita Sutton, Rosa Richardson, and Carolyn Hammell were employed by Health Assurance at the Jefferson County Jail. Sutton and Richardson were employed as medical records clerks. Hammell is an R.N., and she provided mental health services as a psychiatric nurse.

4.      Before the December 1, 2011[,] date that ACH began providing healthcare services at the Jefferson County Jail, it accepted job applications from the Health Assurance employees at the jail.  All of the employees who applied were interviewed by Shelley Nilsson Nordwall, who is ACH's Director of Human Resources, Deborah Ash, who is ACH's Director of Medical Operations, and Sherri Miller, who is the Chief Operations Officer. Sutton, Richardson[,] and Hammell were among the Health Assurance employees who applied and were interviewed on October 26-27, 2011. Sutton and Richardson applied for a position as Medical Clerk.  Hammell applied for a position as a mental health nurse.

5.      The Agreement set forth the duties and obligations of ACH, including ACH's obligations with respect to staffing the jail.  In order to be considered for employment with ACH at the Jefferson County Jail under the Agreement, the qualifications of Health Assurance employees had to be consistent with the Staffing Plan created by ACH in accordance with the Agreement . . . (hereinafter referred to as the "Staffing Plan"). Nordwall, Ash, and Miller were responsible for making the hiring decisions consistent with the Agreement and the Staffing Plan. Karen Fowler, a management employee of Health Assurance, who later became employed by ACH, was not involved in the decision-making process.

6.      With regard to medical records, the Agreement provided that ACH would provide certified medical assistants and/or medical record clerks.  Based on the Jefferson County Jail's healthcare system, inmate population, healthcare concerns and issues and facility goals, ACH and Jefferson County agreed to utilize Certified Medical Assistants (CMAs)

rather than medical records clerks to perform the medical records function.   CMA[]s are certified to be able to assist nurses when necessary, whereas medical records clerks are not qualified to do so.

7.     Based upon the Agreement and the Staffing Plan, ACH filled its medical records positions with CMA[]s rather than medical records clerks.  Neither Sutton nor Richardson was a CMA.  Because Sutton and Richardson were not CMA[]s, they did not meet the qualifications for the medical records positions and were not selected for employment by ACH. . . . [3]

8.     The following individuals, who were qualified CMA[]s based upon their applications and certifications, were hired by ACH to fill the medical records positions: Tamara Tolbert, a 36-year old African American female, Vonnie Hedgepath, a 39-year old Caucasian female, and Devin Pickett, a 33-year old African American female.  At the time of its initial staffing of the jail, ACH did not hire any individuals to perform medical records [sic], other than CMA[]s.  Since ACH has been providing healthcare services at the Jefferson County Jail, it has employed no medical records clerks at the jail.

9.     Pursuant to the Agreement and Staffing Plan, mental health services were to be provided by Qualified Mental Health Professionals (such as licensed professional counselors or clinical social workers) and not R.N.s.  Hammell is not a licensed professional counselor or clinical social worker.  Because Hammell is an R.N. and not a Qualified Mental Health Professional, she was not qualified to perform as a mental health worker under the Agreement and she was not selected for employment. . . . [4]

---

[3]  The court omits the following conclusory language originally offered here by the defendant: "The decision not to hire Richardson and Sutton was unrelated to race or age.  It was also unrelated to the two employee's experience or seniority at Health Assurance.  The decision was based solely on the fact that Richardson and Sutton did not meet the qualifications for the positions because they were not CMA[]s."

[4]  The court omits the following conclusory language originally offered here by the defendant: "The decision not to hire Hammell was unrelated to race or age.  It was also unrelated

10.    At the time of the staffing decisions, there was another R.N. working for Health Assurance at the jail as a psychiatric nurse: Christine Ray, a Caucasian female.  Just like Hammell, Ray was not hired by ACH because she was not a Qualified Mental Health Professional and did not meet the qualifications to be a mental health service provider.

11.    ACH hired two individuals who were qualified for the available mental health worker positions, Glenda Marzette Campbell, a 55 year-old African-American female, and Matthew Foster, a 53-year old Caucasian male.  Both Campbell and Foster were licensed professional counselors.  At the time of its initial staffing of the jail, ACH did not hire any R.N.s as mental health workers.  Since ACH has been providing healthcare services at the Jefferson County Jail, it has employed no R.N.s as mental health workers.

12.    Hammell believes that it is more likely that ACH failed to hire her due to her race rather than due to her age.  Richardson believes "it was a little bit of both" race and age that caused her not to be hired.

13.    During the pendency of this lawsuit, on July 5, 2013, Hammell filed a Chapter 7 Bankruptcy Petition in the United States Bankruptcy Court for the Northern District of Alabama bearing case number 13-03042-TOM7.  Within the petition, Hammell listed all of her assets. In doing so, she failed to list this lawsuit or otherwise identify her claims against ACH.   In particular, with regard to the category: "other contingent and unliquidated claims of every nature," Hammell listed no assets.   Hammell declared under penalty of perjury that her asset schedule was true and correct.

14.    On October 7, 2103, the U.S. Bankruptcy Court entered an Order discharging Hammell from bankruptcy.

---

to her experience or seniority at Health Assurance.  The decision was based solely on the fact that Hammell did not meet the qualifications for the mental health worker position."

8

(Doc. 24 at 2-8) (footnotes and citations omitted).

## B.   **Additional Facts**[5]

### 1.   *Lolita Sutton*

Lolita Sutton started working in the Jefferson County Jail as a medical records clerk in approximately 2004, when the health care contract was between the jail and Cooper Green.  Sutton is an African American female.

### 2.   *Carolyn Hammell*

Carolyn Hammell began working in the jail in the summer of 2006, where she was primarily employed as the mental health nurse.  (Doc. 25-4 at 10(33)).[6]  When asked in deposition whether her duties were the same throughout her employment, she stated:

> There were changes from time to time.  I was asked to go to booking from time to time to work, but, basically, my position was mental health nurse. But I wore a number of hats. As I said, I assisted and sort of supervised the LPNs, what they were doing as far as making sure that the inmates were receiving their injections, and also the drug abuse protocol was given as well.

(Doc. 25-4 at 11(36)).  Hammell is an African American female who was over the age

---

[5]  The court has taken the facts offered by the plaintiffs and, if not disputed, included them here verbatim without citation.  Otherwise, the facts have been cast in the light most favorable to the plaintiff and citations have been included.

[6]  When the court cites to travel transcripts, the court notes first the document number (*e.g.* "Doc. 25-4"), then the specific page of that document number to which the court cites (*e.g.* "at 10"), and finally the specific deposition page appearing on the record page (*e.g.* "(33)").

of forty at the time of the events made the basis of this litigation.

### 3. *Rosa Richardson*

Rosa Richardson worked as a medical records clerk in the jail beginning in 2004, when Augmentation was the company contracted by Jefferson County. Richardson is an African American female who was over the age of forty at the time of the events made the basis of this litigation.

### 4. *Karen Fowler*

Karen Fowler became the Director of Nursing for Health Assurance during the plaintiffs' tenure with Health Assurance, effectively making Fowler the plaintiffs' supervisor. Fowler is currently employed by ACH as a Health Services Administrator, and she essentially is responsible for managing the medical staff working in the jail.

Fowler does not remember the date that she first became aware that ACH was going to replace Health Assurance. (Doc. 25-5 at 5(12)). She just remembers that she "received a phone call one morning that Health Assurance had lost the contract." (Doc. 25-5 at 5(12)). She also remembers that she received the call "within a few days before [she was] introduced to some employees of ACH. It might have been the same day." (Doc. 25-5 at 5(12)). Fowler was referring to a meeting she had in the

10

Fall of 2011[7] with Ash, Miller, and another person from ACH named Shelley Nilsson. (Doc. 25-5 at 5(13)). The three told Fowler that "[t]hey were going to be -- they were with the new contract company for the medical department at the jail." (Doc. 25-5 at 5(14)). They did not offer Fowler a job at that meeting. (Doc. 25-5 at 5(14)).

Fowler officially began working for ACH on December 1, 2011. (Doc. 25-5 at 6(17)). She completed an application for employment with ACH which is also dated December 1, 2011. (Doc. 25-5 at 7(19)). Although she does not know the exact date, Fowler is sure that she was offered employment with ACH prior to December 1, 2011. (Doc. 25-5 at 6(18)). She was also sure that the latest possible date she was offered the job was October 27, 2011. (Doc. 25-5 at 8(24)). Fowler signed a written Offer of Employment on October 27, 2011, accepting the position she currently holds. (Doc. 25-5 at 7(20)).

## 5. *The October 26, 2011, Meeting; the October 27, 2011, Interviews*

On October 26, 2011, a meeting was held at the jail during which Sheriff Mike Hale, Fowler, and three representatives of ACH discussed the new medical services contract with the Health Assurance employees. Those who wished to work for ACH

---

[7] It is not especially clear in the filings, but the parties seem to agree on this date. Regardless, the date is proffered by the plaintiffs and is not specifically disputed by the defendant.

were asked at that meeting to complete an application and then were interviewed on

October 27, 2011.  Each plaintiff recalls the meetings and interviews somewhat

differently.  Accordingly, the court will set out of the cited testimony here.

The following exchange took place in Hammell's deposition:

Q.     You mentioned a second ago some type of meeting where it was discussed. Do you remember what you were told about the fact that Health Assurance was no longer going to have a contract?

A.     I think the sheriff was in there as well, and I can't recall if he spoke first or Karen Fowler. He may have spoke first, but we were told that Health Assurance no longer had the contract. I think the sheriff may have mentioned it first, but there was another company taking over, and that all of us would have a position.

Q.     And that was Sheriff Hale that said that?

A.     That is correct.

(Doc. 25-4 at 15(51-52)).

The following exchange took place in Richardson's deposition:

Q.     All right. So some point after that first meeting with Dr. Reddix, some folks from Advanced Correctional appear at the jail one morning, and they let you know who they are?

A.     Right.

Q.     And that if you're going to want to work for them, there's a process, and it involves filling out an application?

A.     Right.

12

Q.     And you filled out an application?

A.     Yes.

. . .

Q.     At some point, did you talk to anybody at Advanced Correctional about a job at Advanced Correctional?

A.     Well, when we went -- after we filled out the application, one by one they would call everybody downstairs in the conference room and speak with them, you know. And, you know, they would introduce themselves and that they would be taking over, you know, from Health Assurance.

Q.     And so did you have one of those meetings?

A.     Yeah. It was a one-on-one.

Q.     Okay. And you say one-on-one. Was it just --

A.     No, it was three of them.

Q.     So there's three people from Advanced Correctional?

A.     Right.

Q.     And you went down in the basement room and met with them?

A.     Right.

. . .

A.     They talked about, you know, of course that they would be taking over and, you know, about the application. They were going to do everything they could to, you know, maybe try to employ everybody. So anyway, and they would be getting back to us and letting us know who

13

was going to leave and who was staying.

(Doc. 25-3 at 11(34-37)).

The following exchange took place in Sutton's deposition:

Q.      Okay. So the first meeting you remember, though, where the idea of Advanced Correctional coming in was discussed, there was a meeting where Mike Hale was present, Ms. Fowler was present, and some other people from Advanced Correctional were present?

A.      Yes, and all the other employees that was there.

Q.      All the Health Assurance employees?

A.      Yes, sir, that was working actually at the jail, yes.

Q.      And there was basically an announcement that Advanced Correctional was going to be taking over the contract?

A.      Yes. And he said that you all will have y'all's jobs. That was Mike Hale. You know, he said all of you all don't worry. All of yaall [sic] are going to have your jobs.

Q.      All right. So you're saying Mike Hale said during this meeting, you all don't worry, all of y'all will have your jobs?

A.      Correct.

Q.      Now, but a minute ago you were also telling me about somebody from Advanced Correctional telling you y'all have to fill out applications?

A.      Right.

Q.      Was this in the same meeting?

14

A.     Yes, sir. Yes, sir.

Q.     And did you also mention that y'all would have to have interviews?

A.     As they said, well, we've just got to go through a process. You all are going to have interviews and fill out applications in case we have to change different shifts.

Q.     All right. And while you say Mike Hale said y'all don't have to worry, all of y'all will have jobs, nobody from Advanced Correctional said that during that meeting, did they?

A.     Well, Ms. Fowler bowed her head and the lady from Advanced Correctional -- because I don't recall who asked the question -- well, it may have been me, I don't know -- why we have to fill out these applications then and go through another interview if that's the case. And they said -- their response was: Everybody will have their jobs but we may have to change, you know, shifts. We may have to put people on different shifts.

Q.     And who is it that you say said that?

A.     Somebody from Advanced Correctional.  I don't recall her name.

Q.     Before this meeting you've described, had you heard from anybody that Health Assurance was not keeping the contract?

A.     No, sir.

Q.     Because before this meeting you didn't know there was any chance that there was going to be changing of who the employer was going to be?

A.     No, sir, I didn't know there was going to be any change at all.

Q.     And when was it that you think this meeting happened?

15

A.      I'm going to say the early part of November, like November the 1st or something, you know. Or it may have been October the 29th. But I know it was in that, you know –

Q.      In the late October or early November time frame?

A.      Yes. Yes, sir.

Q.      All right. After that meeting, sometime after that meeting, you did fill out an application for employment with Advanced Correctional?

A.      They passed out the applications right then in the meeting and we had to fill them out right then in the meeting. And we filled them out in the meeting, they collected applications in that meeting also, and set up interview times.

(Doc. 25-2 at 21(75)-22(79)).

Each of the plaintiffs filled out an application for employment with ACH. Sutton and Richardson applied to be medical records clerks–the same position which they held with Health Assurance.  Hammell applied to work as a mental health nurse–the same position she held with Health Assurance.  Each was interviewed by the three ACH representatives.  None of the plaintiffs were offered a position with ACH.

Fowler (who had been the plaintiffs' supervisor for several years prior to these interviews) admits that she discussed the applicants with the ACH officers, but denies having any memory of what was discussed.  The following exchange took place in her deposition:

16

Q.     Okay. Were you questioned by anyone at ACH about these applicants and whether or not they should be hired?

A.     Say that again.

Q.     Were you asked about any of these applicants? Was your opinion on whether or not they should be hired sought by the ACH people?

A.     I can't remember specific questions like -- I don't really know what kind of questions you're wanting me to know.

Q.     Okay. I'll give you a hypothetical. If I'm about to hire a whole bunch of people and I have already offered a job to the person who is their boss, before I hire these people, I'm going to ask their boss what their boss thinks of them as an employee. Were you asked for or did you offer any opinions on the applicants to ACH?

. . .

A.     I don't remember being asked like – I don't remember a whole lot about that.

Q.     Okay. So you might have? You just don't remember?

A.     I don't know.

Q.     Just so we're clear, it's your testimony that you do not know whether or not you gave your opinion of any of these applicants to the people at ACH?

. . .

A.     Generalizations, we talked about the employees that worked there.

(Doc. 25-5 at 9(28-29)).

Fowler's handwriting appears on a document listing the names and original

17

hire dates of the Health Assurance employees. (Doc. 26-7 at 1).  She wrote, her name,

"11/03" which is her hire date, and the phrase "offer PT" next to two names on the

list.  (Doc. 26-7 at 1).  There is no dispute that this phrase means "offer part-time."

### 6.   *November 2011*

Sutton stated in her deposition that "sometime in November" Fowler called her

into her office and Sutton met with Fowler and "four employees of Advanced

Correctional." (Doc. 25-2 at 24).  Sutton stated that "[t]hey said that we -- you know,

we would like to -- we went through this and we know that you are very qualified for

everything, but we are not going to be able to keep you because we are not -- we're

not having this position anymore."   (Doc. 25-2 at 24(88)).   She says that she

continued to work for Health Assurance for "a couple of weeks after that meeting."

(Doc. 25-2 at 25(90).  Sutton stated that both before and after that meeting

> Advanced Correctional, they would come with like different people, I
> guess different people they was going to hire and they would -- you
> know, they would come to our office or whatever. And then they would
> come around to the medical records area and would tell us, you know,
> to train people.

(Doc. 25-2 at 25(91).[8]

ACH representatives also met with Richardson to tell her that she would not

---

[8]  The plaintiffs cite this section of Sutton's deposition for the proposition that she and
Richardson were asked to train "their replacements."  (Doc. 26 at 6).  However, this section of
Sutton's deposition does not support that these individuals were plaintiffs' replacements.

be hired.  In her deposition, Richardson stated that, at some point after this meeting, she was at work,

> doing what I do, and [a person from Advanced Correctional] came in with another lady. I don't remember her name. But anyway, she said she wanted to know if this lady could spend the day with me and, you know, to learn my position, what I did, how I did it, and, you know, whatever.

(Doc. 25-3 at 13(42-44)).

Hammell too had a meeting where ACH representatives told her she would not be hired.  At no time, however, did ACH inform Hammell that the position of "mental health nurse" was to be eliminated.[9]  During Hammell's October 27, 2011, interview she was asked if she would be willing to work as the "booking nurse," and she informed them that she would be. Upon being informed her position had been eliminated, Hammell inquired specifically about the booking nurse position, but was told it was unavailable.

It is undisputed that four RN positions were filled by ACH.  (Original fact doc. 26 at 6; admitted doc. 27 at 3). Three of the nurses who filled these positions are Caucasian.[10]

---

[9]  The portion of Hammell's deposition which was cited does not support the plaintiffs' additional assertion that "as an RN she is qualified for any RN position in the jail."  (Doc. 26 at 6 (citing 25-4 at 17(58)-18(62)).

[10]  The plaintiffs also cite Richardson's deposition for the proposition that "[o]f the four RN positions filled by ACH . . . all are younger than Hammell."  (Doc. 26 at 6-7 (citing 25-3 at "page 70").  There is no page 70 to the Richardson deposition.  The plaintiffs have cited no

### 7.  *Miscellaneous Facts*

According to Fowler, it is possible to work in medical records without any sort of certification or degree in the field.  Fowler's unlicenced administrative assistant currently handles a large portion of the medical records responsibility, as ACH currently employs no Certified Medical Assistants at the jail.

On December 17, 2013, Hammell, through her bankruptcy attorney, filed a Motion to Reopen her bankruptcy estate, and an amended schedule of assets listing this litigation as an unliquidated claim.

## III.  ANALYSIS

### A.  *The* McDonnell Douglas *Framework*

The plaintiffs' allege violations of Title VII and the ADEA. "Title VII prohibits employers from discriminating against any individual with respect to the terms of employment on the basis of race or sex. 42 U.S.C. § 2000e-2(a)(1)."  *Phillips v. Aaron Rents, Inc.*, 262 Fed. Appx. 202, 207 (11th Cir. 2008).[11]  "The ADEA prohibits employers from discharging an employee who is at least 40 years of age because of that employee's age. 29 U.S.C. §§ 623(a)(1), 631(a)."  *Sims v. MVM, Inc.*, 704 F.3d

---

additional support for this allegation.

[11]"Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. Rule 36-2.

1327, 1331 (11th Cir. 2013). When those claims are based, as they are here, on

circumstantial evidence of discrimination, the court analyzes them using the familiar

*McDonnell Douglas* burden shifting framework. *Sims v. MVM, Inc.*, 704 F.3d 1327,

1331-33 (11th Cir. 2013) (ADEA); *Dominguez v. Lake Como Club*, 520 Fed. App'x.

937, 940 (11th Cir. 2013) (Title VII) . Under the *McDonnell Douglas* framework,

> a plaintiff must first establish a prima facie case of discrimination, which
> the defendant can rebut by offering a legitimate, non-discriminatory
> reason for the allegedly discriminatory act. *See Reeves v. Sanderson
> Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 2106, 147
> L.Ed.2d 105 (2000). "In other words, the defendant must produc[e]
> evidence that the plaintiff was rejected, or someone else was preferred,
> for a legitimate, nondiscriminatory reason." *U.S. Postal Serv. Bd. of
> Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 1481, 75
> L.Ed.2d 403 (1983) (citation and internal quotation marks omitted). "It
> is important to bear in mind ... that the defendant's burden of rebuttal is
> exceedingly light.... At this stage of the inquiry, the defendant need not
> persuade the court that its proffered reasons are legitimate; the
> defendant's burden is merely one of production, not proof." *Perryman
> v. Johnson Prods. Co.,* 698 F.2d 1138, 1142 (11th Cir.1983) (citation
> and internal quotation marks omitted).

> If the defendant successfully rebuts the plaintiff's prima facie
> case, "the presumption of discrimination is eliminated." *Chapman v. AI
> Transp.,* 229 F.3d 1012, 1024 (11th Cir.2000) (*en banc*). To survive
> summary judgment, the plaintiff must then "come forward with
> evidence, including the previously produced evidence establishing the
> prima facie case, sufficient to permit a reasonable factfinder to conclude
> that the reasons given by the employer were not the real reasons for the
> adverse employment decision." *Id.* (quoting *Combs v. Plantation
> Patterns,* 106 F.3d 1519, 1528 (11th Cir.1997)); *see also Reeves,* 530
> U.S. at 143, 120 S.Ct. at 2106; *Perryman,* 698 F.2d at 1142. To show
> that the employer's reasons were pretextual, the plaintiff must

demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs,* 106 F.3d at 1538. "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Chapman,* 229 F.3d at 1024–25; *see also Combs,* 106 F.3d at 1529 (explaining that the plaintiff must present "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action").

*Cooper v. S. Co.*, 390 F.3d 695, 725 (11th Cir. 2004).

**B.    The Plaintiffs Have Failed to Establish A *Prima Facie* Case of Race or Age Discrimination**

**1.    *The Plaintiffs Have Failed To Inform the Court or the Parties which Elements Form the Basis of Their Claims***

The defendant argues first that the plaintiffs cannot establish a *prima facie* case of race or age discrimination.   The plaintiffs have not cited <u>any</u> set of *prima facie* elements to consider.[12]   It is important for <u>the plaintiffs</u> to set this out because, as the

---

[12]  They do cite <u>one</u> case, writing:

> Defendant also misses the fact that "eliminating" a position by changing the title or shifting duties gives rise to a different standard.

> A variant of the *McDonnell Douglas* prima facie case applies where a position is eliminated; namely, (1) that the plaintiff was in a protected age group and was adversely affected by an employment decision; (2) that she was qualified for her current position or to assume another position at the time of discharge or demotion; and (3) evidence by which a fact finder might reasonably conclude that the employer intended to discriminate on

Supreme Court has noted, "[t]he facts necessarily will vary in Title VII cases," cautioning that not every such case will have the same elements. *McDonnell Douglas*, 411 U.S. at 802, n. 13.  For example, <u>one</u> version of the *prima facie* elements for both Title VII and ADEA claims requires the plaintiff to show that "(1) she was a member of a protected class; (2) she applied for and was qualified for an available position; (3) she was rejected; and (4) <u>the defendant filled the position with a person outside the protected class</u>." *Childress v. Caterpillar Logistics Servs., Inc.*, 369 F. App'x 95, 96 (11th Cir. 2010) (emphasis added) (*citing Walker v. Prudential Prop. And Cas. Ins. Co.,* 286 F.3d 1270, 1274-75 (11th Cir.2002).[13]  By contrast, in *McDonnell Douglas*, the court noted that the plaintiff in a failure to hire race discrimination case

---

the basis of age in reaching the decision at issue. *Earley v. Champion Int'l. Corp.*, 907 F.2d 1077, 1082 (11th Cir.1990). "Where a particular job position is entirely eliminated for nondiscriminatory reasons, for a plaintiff to prevail against his employer he must show that he was qualified for another available job with that employer; qualification for his current position is not enough." *Id.*

*Archie v. Home-Towne Suites, LLC*, 749 F.Supp.2d 1308, 1319 (M.D. Ala. 2010).

(Doc. 26 at 10).  However, the only forms of discrimination addressed in *Archie* are <u>age and gender discrimination</u>.  The case does not address <u>race</u> discrimination.  Also, the plaintiffs cite these elements only to show that the <u>defendant</u> has somehow referred to the wrong elements of the *prima facie* case.  (Doc. 26 at 10) ("Defendant also misses the fact that "eliminating" a position by changing the title or shifting duties gives rise to a different standard.").  They make no attempt to <u>prove</u> each of these elements once they cite them.  Still, the court addresses the *Earley* elements in this section and the next.

[13]  The defendant cites to the same formulation used in *Childress*.  (Doc. 24 at 9).

could establish a *prima facie* case "by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) <u>that, after his</u> <u>rejection, the position remained open and the employer continued to seek applicants</u> <u>from persons of complainant's qualifications</u>." *McDonnell Douglas Corp.*, 411 U.S. at 802 (emphasis added).

Similarly, "[t]he elements of a prima-facie case of discrimination under the ADEA will vary depending on what theory the employee uses to prove his case." *Israel v. Sonic-Montgomery FLM, Inc.*, 231 F. Supp. 2d 1156, 1160 (M.D. Ala. 2002). Either the *Childress* or the *McDonnell Douglas* elements could apply as well in the context of an age case. *Childress*, 369 F. App'x at 96 (Title VII and ADEA); *Eskra v. Provident Life & Acc. Ins. Co.*, 125 F.3d 1406, 1411 (11th Cir. 1997) (noting a formulation of the *prima facie* case under the ADEA requires a showing that "the position [for which the plaintiff applied and was qualified] remained open or was filled by a person outside the protected class.").[14]

Further, in *Earley v. Champion Int'l Corp.*, 907 F.2d 1077 (11th Cir. 1990), the Eleventh Circuit articulated a third test applicable to so-called "reduction-in-force"

---

[14]  "In an ADEA action, the plaintiff is not required to show that the replacement employee was under the age of 40, and outside the protected class." *Eskra v. Provident Life & Acc. Ins. Co.*, 125 F.3d 1406, 1411 (11th Cir. 1997).

cases to be proved by circumstantial evidence.  In such cases

> a plaintiff in a job-reduction case can establish a prima facie case by demonstrating (1) that he was in a protected age group and was adversely affected by an employment decision; (2) that he was qualified for his current position or to assume another position at the time of discharge or demotion; and (3) evidence by which a fact finder might reasonably conclude that the employer intended to discriminate on the basis of age in reaching the decision at issue.

*Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1082 (11th Cir. 1990) (ADEA claim).

The same reduction-in-force analysis can apply in Title VII cases. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998).

By citing to the *Childress*, *McDonnell Douglas*, and *Earley* formulations, the court does not mean to imply that these are the <u>only</u> possible methods to prove a prima facie case.  The court merely cites alternative approaches which, in addition to others, were available to the plaintiffs.

The plaintiff always has "the burden of [first] proving by the preponderance of the evidence a prima facie case of discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981).  The plaintiffs set out <u>no</u> elements for this court to consider on either claim. "'There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments.'" *McIntyre v. Eckerd Corp.*, 251 F. App'x 621, 626

(11th Cir. 2007) (*quoting Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995).  If the plaintiffs chose not to set out, or prove, the elements of their *prima facie* case of race and age discrimination, then the court will not guess at the proper elements, or what proof supports them.  For this reason alone, the race and age discrimination claims must fail.

### 2. *The Plaintiffs Did Not Apply for a Job for which the Employer Was Seeking Applicants*

If this court used the *Childress* or *McDonnell Douglas* formulations of the *prima facie* case, the plaintiffs' claims would still fail because those formulations require the plaintiffs to show that they applied for a position <u>that was available</u>.  As noted above, the plaintiffs applied for the same positions they held with Health Assurance.  Sutton and Richardson applied to be medical records clerks.  Hammell is an R.N. who applied to work as a mental health nurse.  However, these positions were not available at ACH.  ACH agreed with the County to utilize CMAs rather than medical records clerks to perform the medical records function.  It is undisputed that "ACH filled its medical records positions with CMA[]s rather than medical records clerks."  (Doc. 24 at 5).[15]  Mental health services were to be provided by Qualified

---

[15]  Despite the fact that no CMAs are currently employed at the jail, and that at this time "a large portion of the medical records responsibility" is handled by "Fowler's unlicensed administrative assistant"  (proffered fact at Doc. 26 at 7; admitted at doc. 27 at 4), at the time the CMAs were hired, and the plaintiffs were not, the CMAs handled these functions.

Mental Health Professionals (such as licensed professional counselors or clinical social workers) and not RNs.  Accordingly, the plaintiffs did not apply for any <u>available</u> positions.

### 3. *There Is No Evidence that there Were Other Positions at ACH for which the Plaintiffs Were Qualified*

In response to the defendant's argument that the plaintiffs applied for positions which were not available, the plaintiffs state

> [b]ecause the plaintiffs were all basically instructed to apply for the positions they currently held with HA, they were not given the opportunity to compete for any other position for which they may have been qualified. The defendant's misrepresentation to the plaintiffs that they would be keeping their jobs should not operate as an escape from liability after the fact.

(Doc. 26 at 11).[16] They state that "Sutton and Richardson did apply to be medical records clerks, because that is what they were led to believe they should do."  (Doc. 26 at 9).[17]  The plaintiffs also state that "[n]one of the plaintiffs were informed that their designated positions would be eliminated, and all therefore 'applied' for the

---

[16]  The plaintiffs cite to no evidence in support of this statement.

[17]  To support this statement, they merely write "(Exhibit A, pp. 76-78)" without specifically setting out the relevant evidence therein.  The citation is to Sutton's deposition where she, among other things, states that at the October 26, 2011, meeting, Hale "said all of you all don't worry. All of y'all are going to have your jobs."  (Doc. 25-2 at 21(76)).  Sutton also testified that at that same meeting "they said, well, we've just got to go through a process. You all are going to have interviews and fill out applications in case we have to change different shifts." (Doc. 25-2 at 21(77)).  Sutton testified that "the lady from [ACH]" said "[e]verybody will have their jobs but we may have to change, you know, shifts. We may have to put people on different shifts."  (Doc. 25-2 at 21(77)-22(78)).

position they held at the time." (Doc. 26 at 10).[18]  In other words, but for the

---

[18]  In support of this statement, they again merely write "(Exhibit A, pp. 84-85) (Exhibit B, pp. 58-61) (Exhibit C, p. 38)" without specifically setting out the relevant evidence therein. The first part of the citation is a portion of Sutton's deposition where she discusses her interview on October 27, 2011, at which representatives from ACH asked her what she did in medical records, and whether she would be willing to change her shift.  (Doc. 25-2 at 23(84)).  The following exchange took place in Sutton's deposition:

> Q.      So your testimony is that one of the women who was there from Advanced Correctional said: Thank you, we'll be letting you know what shift you'll be on?
>
> A.      Yes. But two of them was asking, you know, questions. One of them was asking me, well, are you willing to change to another shift, and another one will ask you, you know, even a night shift. And then both of them said: Okay, we'll be letting you know what shift you'll be on and whether or not you'll be still in medical records or not. And I said: Okay.
>
> Q.      Say that last part again. Whether or not you'll still be in medical records?
>
> A.      Yes, sir.
>
> Q.      Was there any discussion during the interview about whether they would have medical records clerks?
>
> A.      No. They asked me what I did in medical records, no.

(Doc. 25-2 at 23(84-85)).  The next portion of the citation is to Hammell's deposition where she states that, in her October 27, 2011, interview she was asked

> would I be willing to work in booking. . . . I said, yeah, I would be willing to work in booking from time to time, because I've done it before. But I had no idea that my job as mental health was about to be terminated. I said, but, you know, I'm the mental health nurse, and that's all. They didn't give me an option of saying, well, the mental health nurse is going to be -- we're going to not have a mental health nurse, and we're going to use someone else. That was never told to me. So I think they were just really trying to -- I think that was their way of being really underhanded, for lack of a better word. . . . Because they could have told me at that point, Ms. Hammell, we will no longer – we're going to phase out the mental health position, and so the booking nurse's job will be open. Are you willing to take that as your full-time position now? It was not given to me that way. It was not proposed to me that way.

representations that they "would have a job," and that the application process was a mere formality, the plaintiffs would have applied for other positions that were actually available.

The court assumes that a formulation of the *prima facie* case which includes being tricked into applying for positions which did not exist would be similar to the formulation in *Earley*, which deals with the scenario where a reduction-in-force eliminates the plaintiff's position.  In that case, the plaintiffs still must show that there was some position which existed and for which each plaintiff was qualified.  *Earley*, 907 F.2d at 1082.  It is undisputed that the plaintiffs were not qualified for the new positions which encompassed their old responsibilities.[19]   The plaintiffs have produced no evidence that any other positions existed for which they were qualified.

### a.      Sutton and Richardson

The plaintiffs write that it is "undisputed that each of the plaintiffs had been working in her particular position without incident for several years," and that "[b]oth Sutton and Richardson had all the qualifications needed to work as medical records

---

(Doc. 25-4 at 17(60-61)).  Hammell also states that she "was led to believe that I was going to get a position." (Doc. 25-4 at 17(59)). The final part of the citation is to Richardson's deposition where she states that she was applying for a medical records position.  (Doc. 25-3 at 12(38)).

[19]  Neither Sutton nor Richardson was a CMA and so did not meet the qualifications for the medical records positions.  Hammell is not a licensed professional counselor or clinical social worker, and so she was not qualified to perform as a mental health worker.

clerks in the jail. They had, in fact, been performing these duties (as well as assisting in other ways if needed) since 2004, and maintained these positions through at least one contract change." (Doc. 26 at 8-9).[20]  These statements demonstrate only that the plaintiffs may have been qualified to perform their <u>old</u> positions.  However, "[w]here a particular job position is entirely eliminated for nondiscriminatory reasons, for plaintiff to prevail against his employer he must show that he was qualified for another available job with that employer; qualification for his current position is not enough.  *Earley*, 907 F.2d at 1082-83.

As the defendant notes in its reply brief, "ACH does not dispute that Sutton and Richardson are capable of performing the duties of a medical records clerk. However, it is undisputed that, at the time ACH took over the contract at the Jefferson County Jail, it hired no medical records clerks."  (Doc. 27 at 6).  In the absence of evidence, or even an argument, that Sutton and Richardson were qualified to perform some other job at ACH, those plaintiffs' claims must fail.

### b.    Hammell

The plaintiffs also state: "Hammell is a licensed Registered Nurse who is qualified to hold any RN position in the jail." (Doc. 26 at 9).  While it is undisputed

---

[20]  The plaintiffs also state that "Sutton and Richardson were even asked by ACH representatives to train their replacements."  (Doc. 26 at 9).  As noted above, while the evidence shows that they were asked to train individuals, there is no evidence that these persons were "their replacements."

that ACH filled four RN positions at the jail, the plaintiffs provide no evidence as to the nature of the positions, or the qualifications for each.  The court does not accept that somehow <u>all</u> RN positions are the same.  While being an RN may have been <u>one</u> qualification for the other positions, without evidence as to the nature of the other positions (positions for which Hammell did not apply), the court cannot say that she was qualified <u>just because she was an RN.</u>  The other positions may have had specialized requirements beyond merely being an RN.[21]

> **4.     *There Is No Evidence that any of the Plaintiffs Were Replaced by Someone outside of their Protected Class.  Nor Is there Evidence from which a Fact Finder Might Reasonably Conclude that the Employer Intended To Discriminate Against the Plaintiffs in Reaching the Decision at Issue.***

Because the plaintiffs' positions were eliminated, they cannot satisfy the fourth element of the *prima facie* case as stated by *Childress*–evidence that the defendant filled the position with a person outside the protected class.

The *McDonnell Douglas* formulation requires the plaintiff to show "that, after his rejection, the position [for which the plaintiff was qualified and applied] remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas Corp.*, 411 U.S. at 802.  The defendant's brief

---

[21]  The plaintiffs also note that Hammell "has on occasion worked in booking and other positions." (Doc. 26 at 9).  This vague statement does not identify a position at ACH for which Hammell was qualified.

seems to implicate the *McDonnell Douglas* prima facie case when it states that

> the specific positions Plaintiffs applied for <u>were not filled</u>. Sutton and Richardson both applied to work as medical records clerks. It is undisputed that <u>ACH did not hire any medical records clerks on December 1, 2011[,] and has not employed any medical records clerks since that date</u>. Similarly, Hammell applied for employment as a mental health nurse. It is undisputed that <u>ACH did not hire any mental health nurse on December 1, 2011[,] and has not employed a mental health nurse since that date.</u>

(Doc. 24 at 10) (emphasis added).   There is a difference between the plaintiffs applying for a <u>non-existent position</u>, and a position <u>that existed, but just has not yet been filled</u>.   The defendant's wording <u>in this paragraph</u> implies the latter scenario. However, the plaintiffs have not argued this theory, and, even if they had, they have presented no evidence that the defendant continued to seek applicants for the positions for which the plaintiffs applied.

Finally, using the *Earley* formulation, the court would look to see if there was evidence by which a fact finder might reasonably conclude that the employer intended to discriminate on the basis of age or race in reaching the decision at issue.  Again, although the plaintiffs refer to this requirement in their brief, they make no attempt to satisfy it.[22]

---

[22] Indeed, in this case, there is substantial evidence to the contrary.  Sutton and Richardson were not hired to be CMAs--a position for which they were not qualified and did not apply.  However it is undisputed that two out of the three CMA positions were filled by African Americans.  Hammell was not hired as a mental health worker–a position for which she was not qualified.  However, one of the two individuals hired to fill these positions was African

The plaintiffs have failed to establish a *prima facie* case of race discrimination. Accordingly, their claims must fail.

**C.     Pretext**

Even if the plaintiffs had established a *prima facie* case of discrimination (and they have not), and thereby created a presumption of discrimination, "the employer may rebut the resulting presumption of discrimination by articulating at least one legitimate, nondiscriminatory reason for its action." *Mitchell v. City of LaFayette*, 504 F. App'x 867, 870 (11th Cir. 2013). "Once the employer articulates a legitimate, nondiscriminatory reason for its action, the burden shifts back to the plaintiff to produce evidence that the employer's proffered reason is a pretext for discrimination." *Mitchell*, 504 F. App'x at 870.

**1.     *The Plaintiffs Have Not Shown that the Reasons that Sutton and Richardson Were Not Hired Were Pretextual***

The plaintiffs argue:

> Defendant alleges that plaintiffs Sutton and Richardson were not hired because it chose to employ "certified medical assistants" instead

---

American.  Further, it is undisputed that a Caucasian psychiatric nurse, Christine Ray, was, like Hammell, also not hired because she did not meet the requirements to be a mental health services provider at the jail.  (Doc. 24 at 6).  As to the age claims, although Hammell and Richardson state that they were "over the age of [f]orty at the time of the events made the basis of this litigation," they do not specify their exact age so the best the court can do is say that they were <u>at least</u> forty.  The individuals hired for the two mental health worker positions were ages 53 and 55.  Based on the evidence presented, the court cannot say that these individuals were substantially younger (or even younger at all) than Hammell and Richardson.

33

of medical records clerks. However, ACH no longer employs any
certified medical assistants to manage medical records at the jail, and it
appears that Fowler's secretary does the bulk of it. (Exhibit D, pp.
48-50). No certification is required to work in medical records, and
ACH belies its own alleged reason by using an unlicenced individual to
perform these tasks currently. (Exhibit D, pp. 36, 48-50).

(Doc. 26 at 11). However, the defendant does not argue that CMAs were required

because "certification" is necessary to do the plaintiffs' old job. The defendant states

that it hired CMAs to handle records because "CMA[]s are [also] certified to be able

to assist nurses when necessary, whereas medical records clerks are not qualified to

do so." (Doc. 24 at 4). The defendant states that CMAs were hired because they

"could perform dual functions of patient care of medical records." (Doc. 24 at 12).

As the Eleventh Circuit has said:

A plaintiff is not allowed to recast an employer's proffered
nondiscriminatory reasons or substitute his business judgment for that
of the employer. Provided that the proffered reason is one that might
motivate a reasonable employer, an employee must meet that reason
head on and rebut it, and the employee cannot succeed by simply
quarreling with the wisdom of that reason. *See Alexander v. Fulton
County, Ga.,* 207 F.3d 1303, 1341 (11th Cir.2000) (Title VII case) ("[I]t
is not the court's role to second-guess the wisdom of an employer's
decisions as long as the decisions are not racially motivated."); *Combs,*
106 F.3d at 1541–43. We have recognized previously and we reiterate
today that:

[f]ederal courts "do not sit as a super-personnel department
that reexamines an entity's business decisions. . . ."

*Chapman*, 229 F.3d at 1030 (footnotes omitted). The plaintiffs have not successfully

identified, much less met head on and rebutted the defendant's reason for not hiring Sutton and Richardson.

> **2.     The Plaintiffs Have Not Shown that the Reason that Hammell Was Not Hired Was Pretextual**

The defendant states that Hammell was not hired because it did not hire any pyschiatric nurses, and instead hired only Qualified Mental Health Professionals to work in the mental health position.  (Doc. 24 at 12).  In response, the plaintiffs argue:

> Hammell was obviously qualified to fill any RN position at the jail, even if the position of "mental health" nurse no longer existed. ACH readily admits that it still has several Registered Nurses on staff there, but alleges that Hammell could not be hired simply because there is no longer a "mental health" nurse. She was not given one of the booking nurse positions, for which she was clearly qualified, at it appears that ACH refused to even consider her.

(Doc. 26 at 12).  As the court has noted, there is no evidence that Hammell was qualified to fill "any RN position" in the jail, including the booking nurse position, despite the fact that she was asked about it in her interview.  Regardless, the fact that Hammell is qualified for another position is not evidence that the reason she was not hired is false, much less that discrimination was the real reason.  *See, Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) ("A reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" (*quoting St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).  Indeed, the evidence

indicates that discrimination was <u>not</u> the reason as it is undisputed that a Caucasian psychiatric nurse, Christine Ray, was, like Hammell, also not hired because she did not meet the requirements to be a mental health services provider at the jail.  (Doc. 24 at 6).  The plaintiffs have not shown pretext.[23] [24]

## IV.   CONCLUSION

For the reasons stated herein, the defendant's motion for summary judgment will be **GRANTED**, and this case will be **DISMISSED, with prejudice**.

**DONE** this 11th day of March, 2014.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

[23]  The plaintiffs also try to establish pretext by arguing that Fowler was involved in the hiring process, and that she had discriminatory motive.  However, it is undisputed that Fowler "was not involved in the decision-making process."  (Doc. 24 at 4).

[24]  Since the court finds that the plaintiffs have not established a *prima facie* case, or shown pretext, the court will not discuss the argument that Hammell's claims are subject to judicial estoppel.

36